Varshini Parthasarathy
(State Bar No. 350769)
GUPTA WESSLER LLP
235 Montgomery Street, Suite 629
San Francisco, CA 94104
(415) 573-0336
*varshini@guptawessler.com*

Matthew H.W. Wessler*
GUPTA WESSLER LLP
2001 K Street, NW
Washington, DC 20006
(202) 888-1741
*matt@guptawessler.com*

Kristi C. Kelly*
Casey S. Nash*
KELLY GUZZO PLC
3925 Chain Bridge Road, Suite 202
Fairfax, VA 22030
(703) 424-7570
*kkelly@kellyguzzo.com*
*casey@kellyguzzo.com*

*Counsel for Plaintiff*
**pro hac vice forthcoming*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| KEVIN RUTZ, individually and as representative of the classes,<br><br>Plaintiff,<br><br>v.<br><br>NEWREZ, LLC d/b/a SHELLPOINT MORTGAGE SERVICING and THE BANK OF NEW YORK MELON f/k/a THE BANK OF NEW YORK AS INDENTURE TRUSTEE FOR CWHEQ REVOLVING HOME EQUITY LOAN TRUST, SERIES 2007-D,<br><br>Defendants. | Case No. 3:25-cv-02671-BAS-DDL<br><br>**AMENDED CLASS ACTION COMPLAINT**<br><br>**(1) Fair Debt Collection Practices Act, 15 U.S.C. § 1692e(1);**<br>**(2) Fair Debt Collection Practices Act, 15 U.S.C. § 1692e(2)(A);**<br>**(3) Rosenthal Fair Debt Collection Practices Act, Cal. Civ. Code § 1788.17;**<br>**(4) Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, *et seq.*;**<br>**(5) Declaratory Judgment, 28 U.S.C. § 2201;**<br>**(6) Real Estate Settlement Procedures Act, 12 U.S.C. § 2605**<br><br>JURY TRIAL DEMANDED |

Plaintiff Kevin Rutz, on behalf of himself and the classes set forth below, files this Amended Complaint against Newrez, LLC d/b/a Shellpoint Mortgage Servicing ("Shellpoint") and The Bank of New York Melon f/k/a The Bank of New York as Indenture Trustee for CWHEQ Revolving Home Equity Loan Trust, Series 2007-D ("BONYM") and alleges as follows:

## PRELIMINARY STATEMENT

1. This case concerns Shellpoint's and its predecessor in interest, Specialized Loan Servicing, LLC's ("SLS") false representations to consumers about the amount that they owed on their "zombie" mortgages or "sleeper seconds."[1]

2. In the lead up to the Great Recession, mortgage lenders targeted prospective homebuyers by offering loans that required no downpayment. These lending arrangements typically involved two loans: a primary mortgage that covered approximately 80 percent of the home's appraised value; and a second "piggyback" mortgage that operated as a functional downpayment to cover the remaining sales price. By design, the second mortgage overextended borrowers, resulting in the mass foreclosures that caused the Great Recession.[2]

---

[1] Noah Buhayar, Coulter Jones, Eric Fan, Jeff Kao & Jeremy Diamond, *Zombie Debt: Pay Up or Move Out*, BLOOMBERG (Oct. 6, 2025), https://www.bloomberg.com/graphics/2025-zombie-debt-collectors-mortgage-loans.

[2] The Consumer Financial Protection Bureau ("CFPB") describes "80/20" loans as a type of "piggyback mortgage product" that "involved a first lien loan for 80% of the value of the home and a second lien loan for the remaining 20% of the home's valuation." *See CFPB Issues Guidance to Protect Homeowners from Illegal Collection Tactics on Zombie Mortgages*, CONSUMER FIN. PROT. BUREAU https://www.consumerfinance.gov/about-us/newsroom/cfpb-issues-guidance-to-protect-homeowners-from-illegal-collection-tactics-on-zombie-mortgages (last visited Feb. 1, 2024).

3. Plaintiff purchased a home using this 80/20 mortgage scheme in May 2007. Plaintiff's second mortgage is a home equity line of credit ("HELOC") currently owned by BONYM and serviced by Shellpoint.

4. Under its standard policies and procedures, Shellpoint's predecessor, SLS, stopped sending Plaintiff monthly statements on his second mortgage in or around May 2012, when Plaintiff's personal liability for the mortgage was discharged through a Chapter 7 bankruptcy, and the creditor charged off the loan.[3]

5. But SLS should not have stopped sending Plaintiff, or any consumers with a discharged HELOC, monthly statements. Instead, both the Truth in Lending Act ("TILA"), 15 U.S.C. § 1637(b), and Plaintiff's HELOC agreement required SLS to send Plaintiff monthly statements if a balance was owed and interest or fees were to be assessed..

6. SLS's failure to send Plaintiff monthly statements resulted in waiver of the interest charges. *See e.g.*, *Brooks v. Cama Self Directed IRA, LLC*, 2019 WL 418412, at *9 (D. Md. Jan. 31, 2019) (finding waiver of interest due under a home equity line of credit after a servicer failed to send monthly mortgage statements based on state contract law)

7. After his bankruptcy, Plaintiff did not hear anything about his second mortgage for years. In fact, one of the only times he heard from SLS was when he filed for Chapter 13 bankruptcy in 2016, when SLS filed a proof of claim stating

---

[3] A discharge occurs through bankruptcy, when the bankruptcy debtor's personal liability for the loan is terminated, though for secured debts like mortgages and HELOCs, the lien securing the loan remains attached to the property and may still be foreclosed upon. *See Discharge in Bankruptcy – Bankruptcy Basics*, U.S. COURTS, https://www.uscourts.gov/court-programs/bankruptcy/bankruptcy-basics/discharge-bankruptcy-bankruptcy-basics (last visited Oct. 6, 2025). A charge off is an accounting term that denotes when a debt is written off as uncollectable by the lender for purposes of its accounting statements.

that no interest had accumulated on his second mortgage and that he only owed the outstanding principal.

8. Then, in 2021, Plaintiff started receiving letters (but not monthly statements) threatening foreclosure if he did not pay the outstanding HELOC balance. But according to SLS, Plaintiff now owed more than $131,000 in past due interest charges, plus the remaining principal balance.

9. SLS's representations about the amount that Plaintiff owed on his HELOC were false—Plaintiff did not owe $131,000 in past due interest. Again, most (or all) of these charges had been waived through: (1) SLS's failure to send monthly statements; and (2) SLS's representation to the bankruptcy court that no interest had accrued on Plaintiff's loan.

10. Plaintiff did not understand how this amount was calculated, so he sent a Qualified Written Request ("QWR") to SLS.

11. SLS did not properly respond to the QWR, leaving Plaintiff unable to figure out how his HELOC balance was so high.

12. As a result, Plaintiff brings class claims against Shellpoint for violations of the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. § 1692, *et seq.*, the Rosenthal Debt Collection Practices Act ("Rosenthal Act"), Cal. Civil Code § 1788, *et seq.*; and the California Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200, *et seq.*

13. Plaintiff also seeks a declaratory judgment that Defendants are not entitled to the HELOC balances that they have deceptively inflated by adding previously waived interest or retroactively assessed interest following years of not sending statements.

14. Finally, Plaintiff asserts an individual claim against Shellpoint for its failure to properly respond to his QWR under the Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C. § 2605.

**PARTIES**

15. Plaintiff Kevin Rutz is a resident of Oceanside, California. He is a consumer as defined by the FDCPA, 15 U.S.C. § 1692a(3).

16. Defendant Newrez, LLC d/b/a Shellpoint is a limited liability company organized under the laws of Delaware. Shellpoint is the successor-in-interest to SLS by virtue of the acquisition of SLS by Shellpoint's parent company, Rithm Capital, and the merger of SLS with Shellpoint, effective May 1, 2024.[4] Defendant Newrez, LLC d/b/a Shellpoint is referred to herein as Shellpoint and/or SLS interchangeably for the purposes of liability.

17. Defendant Shellpoint is a debt collector under the FDCPA, 15 U.S.C. § 1692a(6), because it treated Plaintiff's loan as in default at the time it acquired the loan's servicing rights. *See Bridge v. Ocwen Fed. Bank, FSB*, 681 F.3d 355, 362 (6th Cir. 2012); *Schlosser v. Fairbanks Cap. Corp.*, 323 F.3d 534, 537–38 (7th Cir. 2003). Indeed, Shellpoint identified itself as a debt collector on the correspondence that it sent to Plaintiff.

18. Defendant BONYM is a collateral trust that allows investors to have an interest in cash flows from pools of mortgage loans. At all times relevant to this lawsuit, BONYM acted as a debt collector under the FDCPA because it uses interstate commerce in its business, the principal purpose of which is debt

---

[4] *Rithm Capital to Acquire Specialized Loan Servicing LLC*, BUSINESSWIRE (Oct. 2, 2023), https://www.businesswire.com/news/home/20231001340340/en/Rithm-Capital-to-Acquire-Specialized-Loan-Servicing-LLC.

collection. 15 U.S.C. § 1692a(6); *see also Henson v. Santander Consumer USA, Inc.*, 817 F.3d 131, 136 (4th Cir. 2016), *aff'd*, 582 U.S. 79 (2017).

19. Upon information and belief, BONYM's primary business and principal purpose is purchasing defaulted second mortgages on the secondary loan market for nominal amounts and then seeking to recover the full amounts from consumers—in other words, debt collection.

20. In conducting its debt-collection business, BONYM uses interstate commerce, including the mail, when it sends communications to consumers attempting to collect debts from them.

21. Upon information and belief, BONYM's business involves interstate commerce because BONYM owns mortgage assets across the United States, and it communicates with and collects from the debtors of those assets through interstate mails and wires.

22. At all times relevant to this Complaint, SLS acted as BONYM's agent and with BONYM's express authority. All the actions taken by SLS were taken under BONYM's supervision or direction.

## JURISDICTION AND VENUE

23. This Court has federal-question jurisdiction under 28 U.S.C. § 1331, 12 U.S.C. § 2605(f), and 15 U.S.C. § 1692k. It also has supplemental jurisdiction over Plaintiff's state law claims under 28 U.S.C. § 1367.

24. This Court has personal jurisdiction over Shellpoint. Shellpoint conducts business in this State, including real-estate foreclosures, and its conduct giving rise to this Complaint all occurred in this State.

25. This Court has personal jurisdiction over BONYM. BONYM conducts business in this State, including real-estate foreclosures, and its conduct giving rise to this Complaint all occurred in this State.

26. Venue is proper in this Court under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred in this District and Division.

## FACTS

### *The Recent Rise of Illegal Collection Efforts on Zombie Second Mortgages*

27. This case arises from the recent wave of attempts to collect "zombie" second mortgages, which were largely originated before the foreclosure crisis of 2008.

28. Many consumers during the foreclosure crisis filed for bankruptcy, which eliminated their personal liability for paying their second mortgage. The lien on their home remained, however, meaning that if they did not continue paying their mortgage, the lender could foreclose on their home.

29. When a consumer filed for bankruptcy, SLS, like most mortgage servicers as a routine policy, charged off the loan and stopped sending consumers monthly mortgage statements.

30. SLS implemented this policy even though TILA has always required mortgage servicers to send monthly statements to HELOC borrowers, regardless of their bankruptcy status. 15 U.S.C. § 1637(b).

31. Statements, of course, would have alerted consumers of the balance of their loan, that the loans were still accruing interest, and that they were at risk of foreclosure if they did not pay the mortgage.

32. In fact, the CFPB has stated that times of default are "precisely when a consumer most needs the periodic statement" to "document fees and charges to

the consumer."[5] Simply put, "as long as such charges may be assessed, the consumer is entitled to receive a periodic statement."[6]

33. The CFPB has also identified the same issue with servicers like Shellpoint and SLS assessing interest and fees on long-dormant mortgages for periods in which they failed to provide monthly statements to consumers[7]:

> Leading up to the 2008 financial crisis, many lenders originated mortgages to consumers without considering their ability to repay the loans. . . . One common piggyback mortgage product, known as an 80/20 loan, involved a first lien loan for 80 percent of the value of the home and a second lien loan for the remaining 20 percent of the valuation. . . . [In the event of default], the second mortgage holder only receives proceeds from the foreclosure sale if there are any funds left after paying off the first mortgage. As a result, many second mortgage holders of piggyback loans, recognizing that a foreclosure would not generate enough money to cover even the first mortgage, charged their defaulted loans off as uncollectible and ceased communicating with the borrowers. . . . Many borrowers, having not received any notices or periodic statements for years, concluded that their second mortgages had been modified along with the first mortgage, discharged in bankruptcy, or forgiven. In recent years, as home prices have increased and borrowers have paid down their first mortgages, after years of silence, some borrowers are hearing from companies that claim to own or have the right to collect on their long-dormant second mortgages. These companies often demand the outstanding balance on the second mortgage, plus fees and interest, and threaten to foreclose if the borrower does not or cannot pay.

[5] CFPB Official Interpretations, 12 C.F.R. pt. 1026 (Jan. 10, 2014), https://files.consumerfinance.gov/f/201301_cfpb_final-rule_servicing-tila.pdf.

[6] *Id.*

[7] CFPB Advisory Opinion, 12 C.F.R. pt. 1006 (May 1, 2023), https://files.consumerfinance.gov/f/documents/cfpb_regulation-f-time-barred-debt_advisory-opinion_2023-04.pdf.

34. Without the monthly statements, many post-bankruptcy consumers did not understand that they had to continue paying their second mortgage to avoid foreclosure.

35. Because the liens were still underwater following the bankruptcy, investors and servicers charged off the loans and did not attempt to collect the outstanding loan balances through foreclosure. Instead, the loans stayed dormant and were sold—often several times—to various debt buyers and subprime lenders.

36. Despite its failure to send the legally required monthly mortgage statements, SLS continued to assess interest charges and fees on the HELOCs each month, causing the balances to balloon without giving consumers notice of the rapidly increasing balance.

37. In Plaintiff's case, for example, SLS and now Shellpoint have assessed approximately $131,000 in improper interest and charges to Plaintiff's loan, which in addition to the remaining principal balance Defendants are now seeking to collect through the foreclosure of his home.

38. When lenders and servicers fail to provide regular monthly billing statements, they deprive homeowners of the ability to make payments, organize their budgets for regular payments, and catch up when they fall behind.

39. Now, Defendants are attempting to collect the inaccurate interest charges from consumers, including by sending inaccurate acceleration notices and attempting foreclosure on homes.

40. When companies like the Defendants attempt to collect (and actually collect) these improper charges, including through foreclosure, they not only rob consumers of their homes, but also strip them of tens of thousands of dollars in equity—one of the primary ways that low- and middle-income families build wealth.

***Plaintiff's Zombie HELOC***

41. Plaintiff purchased his home in Oceanside, California in May 2007.

42. As was common at that time, Plaintiff financed the purchase using an 80/20 mortgage. His second mortgage was a HELOC with a principal balance of $177,000.00.

43. Plaintiff's HELOC agreement required his lender to send him monthly statements whenever there was a balance of more than $1.00, or for any period in which it assessed a finance charge:

> B. At a minimum, you will send me a periodic statement at the end of each billing cycle in which there is a debit or credit balance of more than one dollar ($1.00) or in which a finance charge has been imposed. The periodic statement will show all Account activity during the billing cycle and contain other important information, including my "New Balance," my Annual Percentage Rate, the amount of my "Minimum Payment Due," my "Payment Due Date" and the place and manner of making payments.

44. Plaintiff made payments on his HELOC until August 2010, when he suffered financial difficulties and could no longer afford the monthly payments.

45. Due to his ongoing financial struggles, Plaintiff filed for Chapter 7 bankruptcy and received a discharge in May 2012.

46. At the time of his discharge, the balance on his second mortgage was approximately $176,747.00.

47. After his Chapter 7 discharge, Plaintiff no longer received monthly statements for his second mortgage.

48. SLS assumed the servicing rights to Plaintiff's second mortgage on May 6, 2013.

49. BONYM purchased Plaintiff's second mortgage in approximately March 2016.

50. Due to ongoing financial difficulties, Plaintiff filed for Chapter 13 bankruptcy in April 2016.

51. On August 18, 2016, SLS filed a proof of claim in Plaintiff's Chapter 13 bankruptcy stating that the balance of Plaintiff's HELOC was $176,747.62 and that there was no interest due on the loan:

Case 16-02014-CL13 Claim 8-1 Filed 08/18/16 Desc Main Document Pg. 4 of 6

**Mortgage Proof of Claim Attachment** (12/15)

**If you file a claim secured by a security interest in the debtor's principal residence, you must use this form as an attachment to your proof of claim. See separate instructions.**

| **Part 1: Mortgage and Case Information** | | **Part 2: Total Debt Calculation** | | **Part 3: Arrearage as of Date of the Petition** | | **Part 4: Monthly Mortgage Payment** | |
|---|---|---|---|---|---|---|---|
| Case number: | 16-02014-CL13 | Principal balance: | $176,747.62 | Principal & interest due: | $0.00 | Principal & interest: | $1,511.88 |
| Debtor 1: | Kevin J. Rutz | Interest due: | $0.00 | Prepetition fees due: | $0.00 | Monthly escrow: | |
| Debtor 2: | | Fees, costs due: | $0.00 | Escrow deficiency for funds advanced: | $0.00 | Private mortgage insurance: | |
| Last 4 digits to identify: | 8199 | Escrow deficiency for funds advanced: | $0.00 | Projected escrow shortage: | $0.00 | Total monthly payment: | $1,511.88 |
| Creditor: | The Bank of New York Mellon f/k/a The Bank of New York as successor Indenture trustee to JPMorgan Chase Bank, National Association for CWHEQ Revolving Home Equity Loan Trust, Series 2007-D | Less total funds on hand: | - $0.00 | Less funds on hand: | - $0.00 | | |
| | | Total debt: | $176,747.62 | Total prepetition arrearage: | $0.00 | | |
| Servicer: | Specialized Loan Servicing LLC | | | | | | |
| Fixed accrual/daily simple interest/other: | Fixed | | | | | | |

**Part 5: Loan Payment History from First Date of Default**

| | Account Activity | | | | | | How Funds Were Applied / Amount Incurred | | | | | Balance After Amount Received or incurred | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| A. Date | B. Contractual payment amount | C. Funds received | D. Amount incurred | E. Description | F. Contractual due date | G. Prin, int & esc past due balance | H. Amount to principal | I. Amount to interest | J. Amount to escrow | K. Amount to fees or charges | L. Unapplied funds | M. Principal balance | N. Accrued interest balance | O. Escrow balance | P. Fees / Charges balance | Q. Unapplied funds balance |
| | | | | Starting Balance | | $0.00 | | | | | | $176,747.62 | $0.00 | $0.00 | $0.00 | $0.00 |
| 04/06/2016 | | | | Petition Date | 04/25/2016 | $0.00 | | | | | | $176,747.62 | $0.00 | $0.00 | $0.00 | $0.00 |

52. Following his Chapter 13 discharge, Plaintiff still did not receive any monthly statements from SLS.

53. When it acquired the servicing rights to Plaintiff's loan, SLS did not send him monthly statements because he had a discharged loan. Upon information and belief, SLS's decision not to send Plaintiff monthly statements for his discharged HELOC was in line with its uniform policies and procedures followed as to all consumers with a discharged HELOC.

54. Under federal law, SLS was required to provide statements for any billing cycle at the end of which the consumer owed an outstanding balance.15 U.S.C. § 1637(b); 12 C.F.R. § 1026.7. By not providing periodic statements, SLS indicated to Plaintiff and the putative class members that no outstanding balance, including interest or fees, existed on their HELOCs for the billing cycles in question.

55. But in 2021, Plaintiff received a notice from SLS stating that his loan was in default and would be foreclosed upon if he did not pay the outstanding balance.

56. Plaintiff immediately reached out to SLS to try and resolve the outstanding loan balance, but he was unable to resolve it with SLS.

57. Even though it did not send him monthly statements, SLS sent Plaintiff documents showing that it demanded payment on his loan for periods when monthly statements were not sent or were waived in his bankruptcy proceeding.

58. For example, on February 3, 2023, SLS sent Plaintiff a payoff statement that reflected a total amount due of $308,025.38, which included $129,253.89 in interest charges.

59. Because he did not understand how the balance of his loan could be so high, Plaintiff sent a QWR to SLS in May 2023.

60. This letter contained all the necessary information to be considered a Qualified Written Request, including Plaintiff's personal information and the loan information, and was sent to the address that SLS designated for Qualified Written Requests.

61. Plaintiff's QWR disputed the balance that SLS claimed was owed on the account, asked SLS to substantiate the amount it claimed was due on his mortgage, and requested documents to support the outstanding balance, including an itemization of all interest charges.

62. In response to Plaintiff's QWR, SLS refused to remove any interest or conduct an adequate investigation that the interest it claimed was actually owed. It also failed to provide Plaintiff with the interest explanation and supporting documents that he requested.

63. Eventually, Plaintiff's loan was transferred from SLS to Shellpoint because of an acquisition by Rithm Capital.

64. On November 5, 2024, Shellpoint sent Plaintiff a Notice of Default and Intent to Accelerate.

65. This notice informed Plaintiff that he needed to pay $194,134.06 to bring his HELOC current or his home would be referred to foreclosure.

66. The amount listed on this letter was inaccurate because it included interest and fees that had been waived by (1) the failure of SLS and other prior loan servicer to send monthly mortgage statements; and (2) SLS's proof of claim in Plaintiff's Chapter 13 bankruptcy.

67. This acceleration letter was an attempt to collect a debt because it informed Plaintiff that if he did not pay the amount listed on the letter, Shellpoint could "sell the property" and that "failure to respond to this letter may result in the loss of your property"—i.e., a foreclosure.

68. As a result of Defendants' conduct, Plaintiff has suffered, and continues to suffer, financial and emotional harm, including, but not limited to, a reduction in his present and future home equity, emotional distress caused by the inaccurate notice of default and the vastly inflated claims of his outstanding debt, and distress from SLS's refusal to correct his account and provide him the documents that he requested.

## CLASS ACTION ALLEGATIONS

69. Plaintiff brings his claims on behalf of himself individually and, under Federal Rule of Civil Procedure 23(b)(3), on behalf of the following classes:

### § 1692e(10) Class

> All consumers (i) who are or were obligors with respect to an open-end HELOC; (ii) whose loan was discharged in bankruptcy; (iii) whose loan was serviced by SLS prior to Shellpoint's acquisition of

the servicing rights to the loan; (iv) whose loan was in default at the time that SLS acquired the servicing rights to the loan; (v) who were not sent monthly statements after their discharge; and (vi) to whom SLS, Shellpoint, or its agents have sent correspondence in the one-year period predating the filing of this lawsuit and continuing through the date of certification that attempted to collect late fees, default-related fees, or interest assessed during periods when monthly statements were not sent.

**§ 1692e(10) Subclass:** All consumers who meet the criteria of the § 1692e(10) Class and whose HELOC was or is owned by BONYM.

**§ 1692e(2)(A) Class**

All consumers (i) who are or were obligors with respect to an open-end HELOC; (ii) whose loan was discharged in bankruptcy; (iii) where a proof of claim was filed in the bankruptcy case listing the outstanding interest as $0.00; (iv) whose loan was serviced by SLS prior to Shellpoint's acquisition of the servicing rights to the loan; (v) whose loan was in default at the time that SLS acquired the servicing rights to the loan; (vi) who were not sent monthly statements after their discharge; and (vii) to whom SLS, Shellpoint, or its agents have sent correspondence in the one-year period predating the filing of this lawsuit and continuing through the date of certification that attempted to collect interest that predated the bankruptcy proof of claim.

**§ 1692e(2)(A) Subclass:** All consumers who meet the criteria of the § 1692e(2)(A) Class and whose HELOC was or is owned by BONYM.

**Rosenthal Act Class**

All California consumers (i) who are or were obligors with respect to an open-end HELOC; (ii) whose loan was discharged in bankruptcy; (iii) whose loan was serviced by SLS prior to Shellpoint's acquisition of the servicing rights to the loan; (iv) whose loan was in default at the time that SLS acquired the servicing rights to the loan; (v) who were not sent monthly statements after their discharge; and (vi) to whom SLS, Shellpoint, or its agents have sent correspondence in the one-year period predating the filing of this lawsuit and continuing through the date of certification that attempted to collect late fees, default-

related fees, or interest assessed during periods when monthly statements were not sent.

**Rosenthal Act Subclass:** All consumers who meet the criteria of the Rosenthal Act Class and whose HELOC was or is owned by BONYM.

**UCL Class**

All California consumers who (i) are or were obligors with respect to an open-end HELOC; (ii) whose loan was discharged in bankruptcy; (iii) whose loan was serviced by SLS prior to Shellpoint's acquisition of the servicing rights to the loan; (iv) who were not sent monthly statements after their discharge; and (v) to whom Defendants or their agents, during the four-year period prior to the filing of this Complaint, sent written correspondence that included interest or late fees that purportedly accrued during any period in which the consumer was not sent a monthly statement.

**Declaratory Judgment Class**

All California consumers who (i) are or were obligors with respect to an open-end HELOC; (ii) owned by BONYM; (iii) whose loan was discharged in bankruptcy; (iv) who were not sent monthly statements after their discharge; and (v) from whom BONYM has asserted a right to collect interest or late fees that purportedly accrued during any period in which the consumer was not sent a monthly statement.

70. Plaintiff is a member and representative of all of the Classes.

71. The Classes satisfy the requirements of Federal Rule of Civil Procedure 23(b)(3). Questions of law or fact common to class members predominate over any questions affecting only individual members, and a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

72. **Numerosity**: The Classes are so numerous that joinder of all class members is impracticable. Given the volume of Defendants' business, there exist hundreds or thousands of class members.

73. **Commonality**: This case presents common questions of law and fact, including but not limited to:

a. Whether Defendants violated the FDCPA and the Rosenthal Act by making false representations about the character, amount, or legal status of a debt and using false representations to attempt to collect a debt;

b. Whether Defendants' conduct was unlawful or unfair under the UCL;

c. The proper scope of injunctive relief; and

d. The proper measure of damages.

74. **Typicality**: Plaintiff's claims are typical of the members of the Classes. The FDCPA, Rosenthal Act, and UCL violations suffered by Plaintiff are typical of those suffered by other class members, and Defendants treated Plaintiff consistently with other class members, in accordance with their standard policies and practices. Discovery will show that Defendants used automated processes to generate and send form debt-collection correspondence to class members and that Defendants maintain electronic records showing which form correspondence was sent to each class member, as well as the date(s) on which such correspondence was sent. Discovery will also show that these debt-collection communications were often identical in both form and substance, except only for recipient-specific information about the recipient's name and address and the specific amounts Defendants claimed were owed. Discovery will also show that Defendants maintain electronic records of amounts that they contend are owed by each borrower, as well as amounts paid by each borrower, including records of the dates on which each payment was made.

75. **Adequacy**: Plaintiff will fairly and adequately protect the interests of the Classes because he and his experienced counsel are free of any conflicts of interest and are prepared to vigorously litigate this action on behalf of the Classes.

76. **Predominance & Superiority**: Class certification is appropriate under Federal Rule of Civil Procedure 23(b)(3) because questions of law and fact common to the Classes predominate over any questions affecting only individual members of the Classes and because a class action is superior to other available methods for the fair and efficient adjudication of this litigation. Defendants' conduct, as described in this Complaint, stems from common and uniform policies and practices, and it has resulted in common violations of the FDCPA, the Rosenthal Act, and the UCL. Members of the Classes do not have an interest in pursuing separate actions against Defendants, as the value of each class member's individual claim is small compared to the substantial expense, burden, and uncertainty of individual prosecution. Class certification also will obviate the need for unduly duplicative litigation, which might result in inconsistent judgments concerning Defendants' practices. Moreover, management of this action as a class action will not present any likely difficulties. In the interests of justice and judicial efficiency, it would be desirable to concentrate the litigation of all class members' claims in a single forum.

77. The administration of this action can be handled by class counsel or a third-party administrator, and the costs of administration will represent only a small fraction of the ultimate recovery to be achieved.

**COUNT I**

**Fair Debt Collection Practice Act ("FDCPA")**

**15 U.S.C. § 1692e(10)**

***(Individually and on* behalf of the § 1692e(10) Class and § 1692e(10) *Subclass Against Defendants)***

78. Plaintiff incorporates the preceding allegations.

79. The FDCPA prohibits debt collectors from using a false representation to collect or attempt to collect a debt (15 U.S.C. § 1692e(10)).

80. Shellpoint violated this provision with respect to Plaintiff and the members of the § 1692e(10) Class when it made false representations in acceleration notices and other correspondence, about the amount of Plaintiffs' and the putative class members' outstanding loan balances.

81. BONYM violated this provision with respect to Plaintiff and the members of the § 1692e(10) Subclass when it, through its agent, made false representations, in acceleration notices and other correspondence, about the amount of Plaintiffs' and the putative class members' outstanding loan balances.

82. These acceleration notices were an attempt to collect a debt because they threatened enforcement of Plaintiff's and the putative class members' liens (i.e., foreclosure) if the amounts listed in the acceleration notices were not paid.

83. Shellpoint's and BONYM's representations about the outstanding balances were incorrect because they included late fees and interest charges that were previously waived when SLS and other prior mortgage servicers did not send monthly mortgage statements.

84. Plaintiff and each member of the § 1692e(10) Class and § 1692e(10) Subclass suffered a concrete injury-in-fact as a result of Defendants' misrepresentations, including, for example, a reduction in home equity, the

assessment of improper fees, defamation, emotional distress caused by the possible loss of their home and equity, intrusion upon seclusion, and informational injury that caused adverse impacts on their debt-making decisions and impaired their ability to resolve their HELOCs and avoid foreclosure.

85. In addition, some members of the § 1692e(10) Class and § 1692e(10) Subclass suffered actual damages when they paid these improper fees or interest to Defendants.

86. Under 15 U.S.C. § 1692k, Plaintiff seeks actual and statutory damages for himself and for each member of the § 1692e(10) Class and § 1692e(10) Subclass, plus reasonable attorneys' fees and costs. He also seeks actual damages for members of the § 1692e(10) Class and § 1692e(10) Subclass who paid improper interest or fees to Defendants, in the amount of any such interest or fees.

**COUNT II**

**Fair Debt Collection Practice Act ("FDCPA")**

**15 U.S.C. § 1692e(2)(A)**

***(Individually and on* behalf of the § 1692e(2)(A) Class and § 1692e(2)(A) *Subclass Against Defendants)***

87. Plaintiff incorporates the preceding allegations.

88. The FDCPA prohibits debt collectors from falsely representing the character, amount, or legal status of any debt (15 U.S.C. § 1692e(2)(A)).

89. Shellpoint violated this provision with respect to Plaintiff and the members of the § 1692e(2)(A) Class when it made false representations in acceleration notices and other correspondence, about the amount of Plaintiffs' and the putative class members' outstanding loan balances.

90. BONYM violated this provision with respect to Plaintiff and the members of the § 1692e(2)(A) Subclass when it, through its agent, made false

representations, in acceleration notices and other correspondence, about the amount of Plaintiffs' and the putative class members' outstanding loan balances.

91. These acceleration notices were an attempt to collect a debt because they threatened enforcement of Plaintiff's and the putative class members' liens (i.e., foreclosure) if the amounts listed in the acceleration notices were not paid.

92. Shellpoint's and BONYM's representations about the outstanding balances were incorrect because they included interest charges that were previously waived in proof of claims filed with bankruptcy courts.

93. Plaintiff and each member of the § 1692e(2)(A) Class and § 1692e(2)(A) Subclass suffered a concrete injury-in-fact as a result of Defendants' misrepresentations, including, for example, a reduction in home equity, the assessment of improper fees, defamation, emotional distress caused by the possible loss of their home and equity, intrusion upon seclusion, and informational injury that caused adverse impacts on their debt-making decisions and impaired their ability to resolve their HELOCs and avoid foreclosure.

94. In addition, some members of the § 1692e(2)(A) Class and § 1692e(2)(A) Subclass suffered actual damages when they paid these improper fees or interest to Defendants.

95. Under 15 U.S.C. § 1692k, Plaintiff seeks actual and statutory damages for himself and for each member of the § 1692e(2)(A) Class and § 1692e(2)(A) Subclass, plus reasonable attorneys' fees and costs. He also seeks actual damages for members of the § 1692e(2)(A) Class and § 1692e(2)(A) Subclass who paid improper interest or fees to Defendants, in the amount of any such interest or fees.

## COUNT III

### Rosenthal Fair Debt Collection Practices Act

### Cal. Civ. Code § 1788.17

***(Individually and on behalf of the Rosenthal Act Class and Rosenthal Act Subclass Against Defendants)***

96. Plaintiff incorporates the preceding allegations.

97. Section 1788.17 of the Rosenthal Act provides that "every debt collector collecting or attempting to collect a consumer debt shall comply with the provisions of Sections 1692b to 1692j, inclusive, of, and shall be subject to the remedies in Section 1692k of, Title 15 of the United States Code." In other words, the Rosenthal Act incorporates by reference the provisions and remedies of the FDCPA, including 15 U.S.C. §§ 1692e and 1692k.

98. Section 1788.2(c) of the Rosenthal Act defines a "debt collector" to include "any person who, in the ordinary course of business, regularly, on behalf of that person or others, engages in debt collection." This broad definition of "debt collector" applies to the FDCPA provisions incorporated by reference into Section 1788.17 of the Rosenthal Act, including 15 U.S.C. §§ 1692e and 1692k. Thus, the Rosenthal Act applies the FDCPA's substantive provisions to a broader group of actors.

99. Defendants therefore violated Section 1788.17 of the Rosenthal Act with respect to Plaintiff and the members of the Rosenthal Act Class when they sent Plaintiff and the putative class members correspondence that misrepresented the amount due on their second mortgages by including interest charges that had been previously waived.

100. Plaintiff and each member of the Rosenthal Act Class suffered a concrete injury-in-fact as a result of Defendants' misrepresentations, including, for example, a reduction in home equity, the assessment of improper fees, defamation, emotional distress caused by the possible loss of their home and equity, intrusion upon seclusion, and informational injury that caused adverse impacts on their debt-

making decisions and impaired their ability to resolve their HELOCs and avoid foreclosure.

101. In addition, some members of the Rosenthal Act Class suffered actual damages when they paid these improper fees and interest to Defendants.

102. Under 15 U.S.C. § 1692k, as incorporated by § 1788.17 of the Rosenthal Act, Plaintiff seeks actual and statutory damages for themselves and for each member of the Rosenthal Act Class, plus their reasonable attorneys' fees and costs. He also seeks actual damages for members of the Rosenthal Act Class members who paid improper interest or fees to Defendants, in the amount of any such interest or fees.

## COUNT IV

### California Unfair Competition Law

### Cal. Bus. & Prof. Code §§ 17200 *et seq.*

***(Individually and on behalf of the UCL Class Against Defendants)***

103. Plaintiff incorporates the preceding allegations.

104. California's UCL prohibits "any unlawful, unfair or fraudulent business act or practice." Cal. Bus. & Prof. Code § 17200.

105. By prohibiting "unlawful business practices," the UCL effectively "borrows" violations of other laws and "treats them as unlawful practices that the unfair competition law makes independently actionable." *De La Torre v. CashCall, Inc.*, 5 Cal.5th 966, 980 (2018).

106. The remedies provided by the UCL "are cumulative to each other and to the remedies or penalties available under all other [California] laws." Cal. Bus. & Prof. Code § 17205.

107. An action for relief under the UCL may be brought by any person "who has suffered injury in fact and has lost money or property as a result" of the complained-of conduct. Cal. Bus. & Prof. Code § 17204.

108. Plaintiff and the putative class members do not have an adequate remedy at law because they can only seek monetary damages, but cannot prevent the foreclosure of their properties through the FDCPA or the Rosenthal Act, or force the Defendants to remove the improper charges from their loan.

109. Here, Defendants' practices were "unlawful" under the UCL because, as alleged above, they violated the FDCPA and the Rosenthal Act.

110. Defendants' practices were also "unfair" under the UCL because it is unethical, immoral, unscrupulous, oppressive, and substantially injurious to consumers to charge them for fees that were previously waived, causing balances to balloon, without any ability of the consumers to mitigate the harm.

111. The harm caused by these business practices vastly outweighs any legitimate utility they possibly could have.

112. Plaintiff and members of the UCL Class suffered injuries in fact. For example, they have increased in their debt loads and a decrease in their home equity. This decreased equity has caused their present and future property interests to be diminished.

113. Because, to this day, Defendants persist in their efforts to collect these illegitimate fees and interest, there is a real and immediate threat that Plaintiff and members of the UCL Class will suffer these same injuries again.

114. Plaintiff and members of the UCL Class are therefore entitled to injunctive relief to correct the balances on their HELOCs; actual damages in the amount of any illegal fees or charges paid by the class members; and the recovery of their reasonable attorneys' fees and costs.

**COUNT V**

**Declaratory Judgment**

**28 U.S.C. § 2201**

***(Individually and on Behalf of the Declaratory Judgment Class Against BONYM Only)***

115. Plaintiff incorporates the preceding allegations.

116. Because Plaintiff and the Declaratory Judgment Class Members were not provided periodic statements, all interest and fees assessed for periods in which BONYM or its predecessors-in-interest failed to provide periodic statements are waived or unenforceable.

117. BONYM is therefore attempting to collect more money than is due under the Plaintiff's and Declaratory Judgment Class Members' loans.

118. Plaintiff and Declaratory Judgment Class Members are subject to ongoing harm absent a declaration that interest and fees are waived or unenforceable, including the accumulation of additional debt, adverse credit reporting of the invalid loans, and abusive collection practices.

119. This dispute and controversy is a justiciable matter that is not speculative, and a resolution by this Court will determine the rights and interests of the parties, as well as the validity, if any, of the disputed interest and fees.

120. Under 28 U.S.C. § 2201, there exists an actual justiciable controversy, and a declaratory judgment is the appropriate mechanism for resolving BONYM's ongoing attempted imposition of retroactive interest and fees.

121. Accordingly, Plaintiff seeks a declaratory judgment that all interest and fees assessed for periods in which BONYM or its predecessors-in-interest failed to provide periodic statements are waived or unenforceable.

**COUNT VI**

## RESPA

## 12 U.S.C. § 2605(e)(2) and 12 C.F.R. § 1024.36(d)

***(Individually on behalf of Plaintiff Against Shellpoint)***

122. Plaintiff incorporates the preceding allegations.

123. As alleged above, Plaintiff submitted a qualified written request to SLS/Shellpoint, and SLS/Shellpoint received the request.

124. SLS/Shellpoint violated 12 U.S.C. § 2605(e)(2) by failing to make appropriate corrections to Plaintiff's account, including removing the improper interest and fees assessed to his loan.

125. SLS/Shellpoint also violated 12 U.S.C. § 2605(e)(2) by refusing to investigate and explain why the requested corrections would not be made.

126. SLS/Shellpoint also violated 12 U.S.C. § 2605(e)(2) and 12 C.F.R. § 1024.36(d) by failing to provide Plaintiff with the information about the interest charges that he requested or to explain why the requested information was unavailable.

127. Because of SLS/Shellpoint's conduct, Plaintiff suffered concrete and particularized harm, including: lost equity and emotional distress—he was actively trying to save his home from foreclosure, but experienced aggravation and stress when he received the QWR response that he would not be able to get the inaccurate mortgage amount corrected so that he could bring his loan current.

128. Discovery will reveal that SLS/Shellpoint's noncompliance with 12 U.S.C. § 2605(e)(2) is a part of a pattern or practice of noncompliance with 12 U.S.C. § 2605(e).

129. For example, upon information and belief, SLS/Shellpoint has a standard practice of refusing to provide certain documents in response to a

consumer's QWR. This practice is the result of standard policies and procedures, which will be produced in discovery.

130. In addition, SLS/Shellpoint also has a practice of violating RESPA. For example, the Consumer Financial Protection Bureau's consumer complaint portal shows that 14,404 mortgage-related complaints have been filed against Shellpoint as of January 13, 2026, including many related to its investigation procedures. Upon information and belief, discovery will reveal that many of these complaints were similar to the issues in this litigation and will establish a practice of noncompliance with the statute.

131. Under 12 U.S.C. § 2605(f), Plaintiff is entitled to recover his actual damages, statutory damages, costs, and attorney's fees from Shellpoint/SLS for each of its violations of 12 U.S.C. § 2605(e)(2).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of himself and the Classes, seeks the following relief:

a. Determining that this action may proceed as a class action under Federal Rule of Civil Procedure 23;
b. Designating Plaintiff as the class representative for the Classes;
c. Designating Plaintiff's Counsel as counsel for the Classes;
d. Issuing proper notice to the Classes at Defendants' expense;
e. Declaring that Defendants committed multiple, separate violations of the FDCPA, the Rosenthal Act, and the UCL;
f. Declaring that amounts claimed by Defendants are not owed;
g. Awarding actual and statutory damages as provided by the FDCPA, the Rosenthal Act, and the UCL;

h. Granting appropriate injunctive relief, including restitution and disgorgement, as provided by the UCL;

i. Awarding reasonable attorneys' fees and costs and expenses; and

j. Granting other relief, in law or equity, as this Court may deem appropriate and just.

## JURY DEMAND

Plaintiff, on behalf of himself and the Classes, demands a trial by jury on all issues triable by a jury.

Dated: January 13, 2025

Respectfully submitted,

*/s/ Varshini Parthasarathy*
Varshini Parthasarathy
(State Bar No. 350769)
GUPTA WESSLER LLP
235 Montgomery Street, Suite 629
San Francisco, CA 94104
(415) 573-0336
*varshini@guptawessler.com*

Matthew H.W. Wessler*
GUPTA WESSLER LLP
2001 K Street, NW
Washington, DC 20006
(202) 888-1741
*matt@guptawessler.com*

Kristi C. Kelly*
Casey S. Nash*
KELLY GUZZO PLC
3925 Chain Bridge Road, Suite 202
Fairfax, VA 22030
(703) 424-7570
*kkelly@kellyguzzo.com*
*casey@kellyguzzo.com*

**pro hac vice forthcoming*

*Counsel for Plaintiff*